UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHRISTY D. BROWN, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 16 C 1071 ) |
| WILLIAM RAINEY HARPER COLLEGE, | ) Judge Rebecca R. Pallmeyer ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Christy Brown, an African-American female, was enrolled in the Practical Nursing Certificate Program at William Rainey Harper College (the "College") in Palatine, Illinois, from August 2014 until she was dismissed from the program in May 2015. Brown believes that several professors at the College discriminated against her based on race and religion in making that decision, and harassed her in the months leading up to her removal.

Brown's suspicions were aroused in March 2015, when she heard a voicemail directed to her phone by mistake. The call came from the College's Director of Nursing, Julie D'Agostino, and was intended for Brown's clinical professor, Monica Sweeney. In this call, D'Agostino was responding to Sweeney's concerns about Brown's practice of praying with her patients. In Plaintiff's view, the call reflects bias on the basis of her religion. Brown reported this voicemail to the United States Department of Education Office of Civil Rights. Thereafter, Brown claims, she was harassed by professors and students, and ultimately removed from the program. She filed suit against the College under Title VI of the Civil Rights Act, 42 U.S.C. § 2000d, Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, 42 U.S.C. § 1983, and the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g.

Brown has amended her complaint several times. The College moves to dismiss the most recent iteration for failure to state a claim. For the reasons below, the College's motion is granted in part and denied in part.

**BACKGROUND**

The facts below are drawn from the complaint, taken as true for purposes of a motion to dismiss. *Anicich v. Home Depot U.S.A., Inc.*, 852 F.3d 643, 648 (7th Cir. 2017).

**I.    Factual Background**

On February 26, 2015, Julie D'Agostino, the Director of Nursing at the college, placed a call to Plaintiff's clinical professor, Monica Sweeney. (2d Am. Compl. [24],[1] at 5.) Though the call was not intended for Plaintiff's ears, it somehow reached her voicemail. (*Id.*) When she played the call, Plaintiff heard D'Agostino responding to concerns Sweeney had evidently expressed about Plaintiff's conduct. (*Id.* at 5–6.) D'Agostino assured Sweeney that D'Agostino knew "how [Brown] can be," but advised Sweeney that Brown was permitted to pray with patients as long as she was "professional and succinct." (*Id.*) D'Agostino left the door open to "remov[ing] [Brown] from the program" if she did not meet that standard. (*Id.*) Brown sees this call as evidence that she "was intentionally being targeted to be set up for a preplanned dismissal . . . because she was being negatively discussed by her clinical instructor and the Director of the Program." (*Id.*)

Brown did not listen to the voicemail until March 2, 2015 (*id.* at 5), and she reported it to the United States Department of Education Office for Civil Rights the same day. (*Id.* at 6.) The Office of Civil Rights ("OCR") is tasked with ensuring that federally-funded educational institutions comply with federal nondiscrimination laws such as Title VI of the Civil Rights Act of 1964. *See* 20 U.S.C. § 3413. A student who believes that a covered educational institution discriminated against them may file a written complaint with OCR within 180 days of the discriminatory conduct. *See* 34 C.F.R. § 100.7(b). OCR then investigates the "circumstances under which the possible noncompliance" occurred. 34 C.F.R. § 100.7(c). The regulations

---

[1]    Plaintiff's second amended complaint appears at paragraphs 1 through 10 of her motion for leave to file an amended complaint, beginning on page 3 of that document. (*See* Minute Order (Sept. 8, 2016) [29].) Page numbers in citations refer to the page numbers published on the motion itself.

require OCR to resolve complaints by "informal means whenever possible," 34 C.F.R. § 100.7(d), but the Department of Education may terminate or refuse to grant further federal financial assistance to the institution (with congressional review) if OCR determines that the institution is not complying with Title VI. 34 C.F.R. § 100.8.

According to Brown's complaint in this court, Brown spoke with someone named Sandy Garcia at OCR "regarding her claim of Retaliation and Discrimination." (2d Am. Compl. 6.) Brown does not provide much detail about this interaction with OCR. It is unclear, from the language of the second amended complaint, whether Brown filed a formal complaint with OCR or simply discussed her concerns with Ms. Garcia. Nor does the court know what Garcia's role at OCR was.

It appears that the March 2 conversation with Garcia at OCR was not Brown's first contact with that agency. Brown claims that the voicemail was evidence that the College's staff was retaliating against her for a previous "whistle blowers complaint [that] was file[d] with the OCR" (*id.*), though she offers no details concerning the previous incident or the complaint. Regardless, once Brown spoke with Garcia at OCR on March 2, 2015, Brown asserts that Julie D'Agostino, Monica Sweeney, and another professor, Joella Tabaka, all conspired to retaliate against her and create a hostile environment at the College.[2] (*Id.*) This ultimately resulted in Brown's termination from the program, though the complaint does not say what the purported reason for removing Brown was, or when it occurred.

The same day that D'Agostino left the voicemail in late February, Brown was at her clinical placement at Alexian Brothers Medical Center, where Sweeney asked her to place an intravenous line ("IV") in a patient's arm. (2d Am. Compl. 12–13.) Brown alleges that the hospital staff themselves had been unable to find a vein, and had recommended that the line be

---

[2] Brown also asserts that Rebecca Barron was responsible for the "creation of a hostile environment" (2d Am. Compl. 6), but does not explain who Barron is or what she did to contribute.

3

placed by a specialist. (*Id.* at 13.) Though Brown, a student, was unwilling to attempt to insert the IV, her instructor, Sweeney, allegedly insisted that she try to complete the procedure. (*Id.*) Brown failed to do so, and when Sweeney also attempted to place the line, she too was unsuccessful. (*Id.*) Sweeney then made the baseless accusation that Brown had become argumentative in front of the patient. (*Id.*) Shortly thereafter, Brown's grade in the clinical class was changed (presumably by Sweeney, though Brown does not specifically allege this) from passing to failing. (*Id.*)

Though Brown does not explain how Sweeney, Tabaka, and D'Agostino became aware of Brown's discussions with OCR, she describes several other incidents that she claims were retaliation for her contacts with the agency. (2d Am. Compl. 6.) First, before Brown attended a class on March 31, 2015, other students told Brown that the instructor—who is not identified—made "accusations" against her in front of the class when she was not there. (*Id.* at 10.) Brown does not further describe what she believes the instructor said. Second, Joella Tabaka "leaked" Brown's "prior enrollment and school student files" to other students; the complaint provides no more information about this episode, and the court is unaware of what these files contained. (*Id.*) Third, Tabaka repeatedly changed the clinical schedule, resulting in Brown's losing her job because she had to miss work to complete her clinical shift assignments. (*Id.* at 9.) Finally, Brown claims that, after those incidents, the students turned against her: one student told Brown that she made other people uncomfortable when she spoke in class (*id.* at 10), and Brown recalls that on April 28, 2015, while a group of students and Brown waited outside Tabaka's office for Tabaka's office hours to begin, the other students rolled their eyes, made faces, and stuck up their middle fingers at Brown. (*Id.* at 11).

Brown claims she had scheduled an appointment with Tabaka for that day, but Tabaka was an hour late. (2d Am. Compl. 11.) When Brown asked her why she was an hour late, Tabaka offered no answer. (*Id.*) But then, as Brown began to walk away, Tabaka muttered something under her breath and "gave [Brown] two thumb down fingers." (*Id.*) Brown reported

4

this episode to the Dean and Provost of the college, as well as the Department of Education's Office of Civil Rights (though again, Brown does not allege whether she filed a formal complaint). (*Id.* at 12.) Brown claims that Tabaka repeated the gesture towards Brown in front of her classmates at the graduation ceremony in May 2015. (*Id.*) (Brown was apparently allowed to participate in graduation, though she was not permitted to complete the program.)

On another occasion, Brown alleges that Tabaka directed another student in the program, Haley Warman (a Caucasian female), to contact Brown about Brown's attendance at an orientation session. (*Id.* at 13.) Shortly afterward, Tabaka and Warman sent Brown a number of "accusatory text messages," that made hostile and threatening allegations. (*Id.*) The complaint does not report when these incidents occurred, or provide more detail about the contents of the messages.

These incidents allegedly culminated in Brown's being dismissed from the program. The exact circumstances of her removal are not clear. As noted, Brown has alleged that after the episode with Sweeney and the IV, her clinical grade was changed to a failing grade. (2d Am. Compl. 13.) She alleges that she learned in May 2015 that she was "unjustly being kept from advancing to Capstone (a final externship of the program) and then told by the Director of Nursing [D'Agostino] that she would not be receiving her certificate." (*Id.* at 11.) The complaint does not say, however, whether she was removed from the program for failing grades or for (purported) behavioral reasons, nor does Brown explain who made that decision or who had input into it. Finally, it is unclear exactly when Brown was dismissed, as she attended the program's graduation but evidently did not receive the certificate. (*Id.* at 12.) In Brown's clearest allegation of racial discrimination, she asserts that two Caucasian students—Haley Warman and Erin Williams—were allowed to complete an extended summer course to receive their certificates even though they had "flunked out." (*Id.* at 14.) Brown implies that she, like they, "flunked out," but the extended course was not offered to her. (*Id.*)

5

Brown details many damages that flowed from her treatment by the College, including losing her job, being forced to pay for a qualifying exam that she was ineligible to take, and future lost wages. (2d Am. Compl. 14–16.)

## II.      Procedural History

Brown filed her initial complaint *pro se* on January 25, 2016 against the College and various unnamed faculty instructors and parties [1]. The court granted Brown leave to proceed *in forma pauperis* but dismissed unnamed parties from the suit. (Order (Feb. 16, 2016) [5].) The College appeared and moved to dismiss the complaint [10]. The court granted Brown's request for leave to file an amended complaint (Minute Order (June 13, 2016) [20]), but ultimately granted the College's motion to dismiss. (Order (Jul. 11, 2016) [23].)

With leave of court, Brown has now submitted a second amended complaint. For the reasons set forth here, the College's motion to dismiss is granted in part and denied in part.

## **DISCUSSION**

Though Brown refers to Title VI, Title IX, 42 U.S.C. § 1983, and the Family Educational Rights and Privacy Act ("FERPA") in her complaint, not all of these statutes are applicable to the facts she provides in her complaint. Assuming that the College is covered by the Title VI of the Civil Rights Act,[3] it is prohibited from discriminating against Brown based on race, color or national origin. 42 U.S.C. § 2000d *et seq.* Religious discrimination, however, is not covered by Title VI. *Id.*; *see also Lubavitch-Chabad of Ill., Inc. v. Nw. Univ.*, 6 F. Supp. 3d 806, 815–16 (N.D. Ill. 2013). Brown's complaint asserts that the College's actions violated Title IX (2d Am. Compl. 3), but beyond mentioning that she is a female (*id.* at 5), she does not allege any discrimination based on her gender.[4] 42 U.S.C. § 1983 protects, among other things, individuals' constitutional rights to free speech and free exercise of religion from incursions by

---

[3]      The College has not denied that it is the recipient of federal funding.

[4]      Brown also mentions that she is "nontraditional aged" for the program (2d Am. Compl. 5), but does not assert age-related claims, or any facts from which such a claim could be plausibly derived.

6

state actors. As a state community college, the College is likely a state actor for these purposes. *See Hosty v. Carter*, 412 F.3d 731, 736 (7th Cir. 2005) (publicly-funded university was state actor in censoring student newspaper). Therefore, in order to survive the motion to dismiss, Brown must demonstrate that the College's conduct is the result of discrimination based on her race, national origin, or color under Title VI, or that the College discriminated against her based on her religion or speech under § 1983.

Brown also alleges that "plaintiff's prior enrollment and school student files were leaked" to other students by Tabaka (2d Am. Compl. 10), which she categorizes as a claim under FERPA. (*Id.* at 3.) The Family Educational Rights and Privacy Act protects the privacy of student education records by requiring recipients of federal education funding to obtain the consent of a parent or the student—if the student is over eighteen—before any records can be released. *See* 20 U.S.C. § 1232g(b). FERPA is enforced by the Department of Education, which has the power to strip an offending program of federal funds. *See* 20 U.S.C. § 1231b-2(d). There is no private right of action under the statute, *Gonzaga Univ. v. Doe*, 536 U.S. 273, 287 (2002), an obstacle which is discussed further below.

### I. Legal Standard

The court must determine, on a motion to dismiss, whether the complaint contains allegations which "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level[.]" *Kubiak v. City of Chicago*, 810 F.3d 476, 480 (7th Cir. 2016) (quoting *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007)). All facts alleged in the complaint are taken as true, and the plaintiff is given "the benefit of any reasonable and favorable inferences from those allegations." *Anicich v. Home Depot U.S.A. Inc.*, 852 F.3d 643, 646 (7th Cir. 2017). "While a plaintiff need not plead 'detailed factual allegations' to survive a motion to dismiss, she still must provide more than mere 'labels and conclusions or a formulaic recitation of the elements of a cause of action[.]'" *Bell v. City of*

*Chicago*, 835 F.3d 736, 738 (7th Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Courts handle *pro se* complaints with particular generosity, and these complaints are not necessarily held to the same standard as those drafted by lawyers. *Beal v. Beller*, 847 F.3d 897, 902 (7th Cir. 2017). For this reason, the allegations in *pro se* complaints are liberally construed to state a claim. *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 811 (7th Cir. 2017).

## II. Overt Discrimination

The Civil Rights Act of 1964 and its amendments prohibit actors in a variety of settings—ranging from public accommodations to employment—from discriminating against people because of certain characteristics, such as gender, race, religion or national origin. 42 U.S.C. § 1981 *et seq*. Relevant to this case, Title VI of the Act prohibits any program or activity that receives federal financial assistance from discriminating against individuals on the basis of race, color, or national origin. 42 U.S.C. § 2000d. This portion of the statute also provides a private right of action, which means that individuals who have been wronged in violation of Title VI may bring an action to enforce the statute against a wrongdoer. *Alexander v. Sandoval*, 532 U.S. 275, 279 (2001). Individuals may sue only for Title VI violations based on intentional discrimination. *Id.* at 280–81, 293 (holding that individuals may not enforce portions of Title VI prohibiting "disparate impact" on classes protected under the statute). A plaintiff may prove intentional discrimination through the overt acts of defendant, or by demonstrating that she was meeting the expectations of the program and that other students outside her protected class did

8

not suffer adverse actions.[5] *Andriakos v. Univ. of S. Ind.*, No. 92-3600, 19 F.3d 21 (Table), 1994 WL 83331, at *3–4 (7th Cir. Feb. 17, 1994).

Though Brown claims that Tabaka, in particular, generally employed "racially divisive tactics" (2d Am. Compl. 13), the only connection that Brown makes between any College employee's conduct and Brown's race are that (1) Tabaka instructed a Caucasian student, Haley Warman, to contact Brown regarding Brown's attendance at a training, and that (2) two white students were allowed to participate in a special, extended summer program in order for them to earn their certificates, even though they had "flunked out" of the program. (*Id.* at 13–14.) The court does not understand how the first allegation relates to discrimination against Brown based on her race. Read generously, however, the second allegation suggests more favorable treatment of similarly-situated white students. Brown was not offered the opportunity to participate in the extended summer program. (*Id.* at 14.) Brown implies that she, like they, "flunked out" of the program (*see id.*), but she did not enjoy the same chance to complete the certificate. (*Id.*) -+Brown may be able to produce more evidence, after she has had an opportunity for discovery, about how these comparators were similarly situated to her. At the motion to dismiss stage, however, her allegations that white students who were in a similar position received more favorable treatment is sufficient to state a claim under Title VI.

### III. Title VI Retaliation

To succeed on a claim for retaliation under Title VI, a plaintiff must establish that (1) she engaged in protected activity, (2) her educational institution took an adverse action against her, and (3) a causal connection existed between the protected activity and the adverse action.

---

[5] This framework of proof, created in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), is applicable to Title VI claims. *Andriakos*, 1994 WL 83331 at *4 (citing *Hankins v. Temple Univ.*, 829 F.2d 437, 440 (3d Cir. 1987)). Though *Ortiz v. Werner Enterprises* eliminated explicit categorization of evidence into "direct" and "indirect" types of discrimination, *McDonnell Douglas* remains a relevant consideration in proving discriminatory animus. *Ortiz v. Werner Enterps.*, 834 F.3d 760, 766 (7th Cir. 2016) ("Today's decision does not concern *McDonnell Douglas* or any other burden-shifting framework, no matter what it is called as a shorthand.").

*Peters v. Jenney*, 327 F.3d 307, 320 (4th Cir. 2003); *Weiler v. Village of Oak Lawn*, 86 F. Supp. 3d 874, 889–90 (N.D. Ill. 2015) (collecting cases supporting Title VI retaliation); *Su v. E. Ill. Univ.*, 565 Fed. App'x 520, 521–22 (7th Cir. 2014) (acknowledging Title VI retaliation cause of action). Filing an official complaint constitutes protected activity, for which employees of federally-funded programs may not retaliate, as long as the underlying complaint asserts that the plaintiff is suffering discrimination because of the plaintiff's protected class. *Cf. Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) (in Title VII context, complaint must "indicate that discrimination occurred because of sex, race, national origin, or some other protected class" to be protected activity). "Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Id.*

Brown made at least two complaints to the Department of Education's Office of Civil Rights, but so far as the court is aware, neither concerned discrimination based on a protected class. (Her first complaint is referenced only in passing in her pleadings before this court, and Brown provided no detail about the substance of the complaint.) Her complaint regarding the voicemail concerned religious discrimination, which is not covered by Title VI. *See* 42 U.S.C. § 2000d. In her last complaint, Brown reported that Tabaka had made a "two thumbs down" gesture—insulting and unprofessional to be sure, but nothing about the alleged conduct suggests discrimination on the basis of a protected status. There are not sufficient allegations in the complaint to establish a claim of retaliation on the basis of protected activity under Title VI.

**IV.    First Amendment Retaliation**

Brown also characterizes her complaint as one for retaliation under 42 U.S.C. § 1983 (2d Am. Compl. 3.) That statute provides a cause of action for the violation of an individual's constitutional rights by a state actor. *See* 42 U.S.C. § 1983. Because the College has not denied that it is a state actor, the court presumes for purposes of this motion that § 1983

protects Brown's right to free speech and exercise of religion. *See Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of Law v. Martinez*, 561 U.S. 661, 697 & n.27 (7th Cir. 2010) (considering both free exercise and free speech claims of student group).

The College broadly asserts that Brown has not adequately stated her claims, or has presented them in a narrative, confusing fashion. Under the generous standards afforded to *pro se* complaints, however, *see Parker*, 845 F.3d at 811, Brown has alleged facts sufficient to substantiate these claims. To state a retaliation claim for First Amendment-protected activity, a plaintiff must allege that (1) she engaged in protected expression, (2) she suffered a deprivation likely to deter protected activity, and (3) the plaintiff's activity was a motivating factor in the defendant's retaliation. *Cf. Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006) (delineating standard in employee speech context); *Galdikas v. Fagan*, 342 F.3d 684, 698 (7th Cir. 2003) *overruled on other grounds by Spiegla v. Hull*, 371 F.3d 928, 941–42 (7th Cir. 2004). Most First Amendment cases in the university context concern speech by university *employees*, and in those cases, the employee is protected only if she spoke out on "matters of public concern." *See Roake v. Forest Pres. Dist. of Cook Cnty.*, 849 F.3d 342, 346 (7th Cir. 2017). That restriction does not obviously apply to college students; after all, the Seventh Circuit has held that prisoner speech does not need to meet the public concern test in order to support a claim of retaliation, *cf. Bridges v. Gilbert*, 557 F.3d 541, 551 (7th Cir. 2009), and there is no reason to believe the standard for college students is more stringent.

Brown engaged in protected speech when she complained to the Office of Civil Rights, as well as to the Dean and Provost, about D'Agostino's voicemail and Tabaka's "thumbs down" gesture. After Brown complained, she alleges, Sweeney lowered her grade in the clinical course. (2d Am. Compl. 13.) Tabaka changed Brown's clinical assignments repeatedly, resulting in Brown's losing her job. (*Id.* at 9.) Finally, Brown was dismissed from the program. (*Id.* at 5.) Though she does not say exactly who was involved in the dismissal decision, there is a basis for concluding that D'Agostino, the Director of Nursing, had input into it: D'Agostino

11

allegedly told Sweeney that "we can remove [Brown] from the program." Construed in the light most favorable to Brown's claim, the voice mail allegations support an inference that Sweeney was able to make complaints directly to D'Agostino, and that D'Agostino invited some future input into the dismissal decision. At the motion to dismiss stage, Brown's allegations are sufficient to state a First Amendment retaliation claim based on her protected speech.

Brown also claims that Sweeney and D'Agostino retaliated against her after Sweeney reported to D'Agostino that Brown was praying with patients. Sweeney forced Brown to attempt the difficult IV placement, and then falsely accused her of becoming argumentative. D'Agostino, as the Director of Nursing, specifically mentioned removing Brown from the program in her call to Sweeney. However plausible it is that D'Agostino (who stood up for Brown's right to pray with patients) ultimately engineered her removal from the program because of this practice, Brown's allegations are sufficient at the pleading stage: Sweeney had it out for Brown because of Brown's religious practice and D'Agostino left the door open to removing Brown from the program if Sweeney found that she was not "professional and succinct." The allegations are consistent with an inference that Sweeney successfully lobbied to have Brown removed for a prohibited reason. The motion to dismiss is denied as to Brown's § 1983 free speech and free exercise claims.

## V.     Educational Privacy

Brown also alleges that Tabaka's "leak" of her educational files to other students violated FERPA. (*See* 2d Am. Compl. 3, 10.) Individuals have no private right to enforce FERPA, however; the statute permits only the Department of Education to enforce the statute against educational institutions. *Gonzaga Univ.*, 536 U.S. at 287. In *Gonzaga*, a former teaching student sued Gonzaga University under FERPA after an administrator disclosed information about him to the State of Washington's teacher certification agency without his permission. *Id.* at 277. A jury found in favor of the student. After state court appeals, however, the U.S. Supreme Court concluded that FERPA does not create an individual right to sue under the

statute itself or under 42 U.S.C. § 1983, *id.* at 290–91. As required by *Gonzalez*, the court finds that Brown is prohibited from bringing a claim under FERPA. This count is dismissed.

## CONCLUSION

Defendant's motion to dismiss [26] is granted in part: Plaintiff's FERPA and Title IX claims are dismissed. Defendant's motion is otherwise denied, and Defendant is directed to answer the allegations that survive this motion within 21 days. Rule 16 conference is set for September 5, 2017, at 9:00 a.m.

ENTER:

Dated: August 1, 2017

_____
REBECCA R. PALLMEYER
United States District Judge